UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NICHOLAS EDMUNDS,

    Plaintiff,

v.

BOARD OF CONTROL OF EASTERN
MICHIGAN UNIVERSITY, LIZBETH
STEVENS, SARAH GINSBERG, WILLIE
CUPPLES, CAROLE WOOD GORENFLO,
RONALD HOODIN, and LIDIA LEE,

    Defendants.
    _____/

Case No. 09-11648

Honorable Patrick J. Duggan

**OPINION AND ORDER**

At a session of said Court, held in the U.S.
District Courthouse, Eastern District
of Michigan, on December 23, 2009.

PRESENT:    THE HONORABLE PATRICK J. DUGGAN
                    U.S. DISTRICT COURT JUDGE

On April 30, 2009, Plaintiff Nicholas Edmunds filed the present lawsuit against the Board of Control of Eastern Michigan University ("EMU"), Dr. Lizbeth Stevens, Dr. Sarah Ginsberg, Dr. Willie Cupples, Dr. Carol Wood Gorenflo, Dr. Ronald Hoodin, and Dr. Lidia Lee. In his complaint, Edmunds alleges that, while he pursued a graduate degree in Speech-Language Pathology ("SLP"), EMU discriminated against him on the basis of disability and gender. Edmunds also alleges that the individually named defendants—all faculty members of the SLP program—violated his constitutional right to due process and engaged in First

Amendment retaliation.[1] Presently before the Court is a Motion for Summary Judgment from all of the defendants filed on November 13, 2009. The motion has been fully briefed and the Court held oral argument on December 22, 2009. For the reasons set forth below, the Court grants defendants' motion.

**I. Factual and Procedural Background**

This lawsuit arises out of events that occurred while Edmunds pursued a master's degree in SLP at EMU. According to representations made by counsel at the December 22 hearing, the facts of this case are not in dispute. Prior to enrolling at EMU, Edmunds had obtained his bachelor's degree in Spanish and German and a master's degree in the Art of Teaching, both from Wayne State University. While pursuing the master's in teaching, Edmunds was also employed as a high school teacher. In January 2005, Edmunds began taking courses for the SLP program at EMU. A student who pursues the SLP Master's Degree at EMU on a full-time basis without failing any classes could potentially graduate after three full years of study. (*See* Defs.' Mot. Ex. 2 ¶ 4.)

By January 2006, however, Edmunds had failed three courses and was placed on academic probation. (Edmunds's Dep. at 38-39.) After retaking those three courses in the Winter 2006 semester, Edmunds enrolled in Clinical I, the first of two required on-campus clinicals, in the Spring/Summer semester.[2] (*See* Defs.' Mot. Ex. 4 at 10.) Edmunds failed

---

[1] Edmunds's complaint also includes a claim that all of the defendants violated public policy. (Compl. ¶¶ 117-25.) Edmunds has since agreed to the dismissal of that claim. (Pl.'s Resp. ¶ 6.)

[2] In the briefing of the present motion, the parties refer to three different semesters without explicitly defining those terms. When read in context, however, it appears that EMU has a "winter" semester running from January to April, a "spring/summer" semester running from

that course as well and re-enrolled in the Fall semester. At mid-term of the Fall semester, Edmunds learned that he was failing Clinical I for the second time.[3] Edmunds's clinical supervisor suggested and Edmunds agreed to the formation of a faculty support team that would provide assistance and strategies for moving forward. (Defs.' Mot. Ex. 5.) At a meeting of the faculty support team on November 10, 2006, Edmunds agreed to a multi-part remediation plan whereby he would withdraw from the clinic, refrain from enrolling in classes in the Winter 2007 semester, and use that time to practice his skills and gain exposure to the practice of speech pathologists outside the clinical setting. (Defs.' Mot. Ex. 6.)

As part of the remedial plan, Edmunds volunteered during the Winter 2007 semester at the Detroit Institute for Children ("DIC"). At some point during that time, Edmunds discussed with his faculty supervisor, Dr. John Tonkovich,[4] the possibility of completing Clinical I at the DIC. (Pl.'s Mot. Ex. 6.) Tonkovich apparently informed Edmunds that the alternative off-campus placement had been approved but there was no formal record of any approval, Edmunds did not enroll in Clinical I or any other credit-earning course, and Edmunds kept the alternative arrangement a secret to avoid what he suspected would be "chaos" regarding the atypical arrangement. (Edmunds's Dep. at 83-88; Pl.'s Resp. Ex. 7.)

---

May to August, and a "fall" semester running from September to December.

[3]Failing a course more than once can result in expulsion from the SLP graduate program. (*See* Defs.' Mot. Ex. 4 at 5.)

[4]At the time of these events, Tonkovich was in some kind of dispute with other SLP faculty and clinical supervisors. (*See* Defs.' Mot. at 4 n.3; Pl.'s Resp. Ex.7.) Tonkovich took a leave of absence from the SLP program beginning in the Fall 2007 and, when he returned to EMU, was prohibited from rejoining the SLP program. (Pl.'s Resp. Ex. 18.)

After completing the work he believed necessary to satisfy the requirements of Clinical I at the DIC, Edmunds sent a letter dated June 25, 2007, to the Dean of EMU's College of Education, Dr. Vernon Polite. Therein, Edmunds touted his success and experiences at the DIC, expressed frustration with the on-campus clinical, complained that his clinical supervisor had not intervened earlier in his struggle with Clinical I, and requested that his clinical files be investigated. Edmunds also e-mailed the letter to Tonkovich, Defendant Stevens (then the SLP Program Coordinator), and Dr. Lynne Rocklage (Department Head of Special Education). (Pl.'s Resp. Ex. 9.) At some point in the Fall 2007 semester, Edmunds was awarded credit for Clinical I based on the work he completed at the DIC. (Edmunds's Dep. at 104; Defs.' Mot. Ex. 7 ¶ 7.)

Also during the Fall 2007 semester, Edmunds began inquiring about the possibility of completing Clinical II off-campus in the Winter 2008 semester. In early October, Edmunds's new academic advisor, Defendant Ginsberg, informed Edmunds that he would have to put his request for off-campus placement in writing for consideration by the SLP faculty. Edmunds raised the issue again in a November 5, 2007, e-mail to Ginsberg wherein he requested to be allowed to make an oral presentation regarding his request at a faculty meeting. Ginsberg responded that Edmunds should submit his request in writing and encouraged him to submit his request as quickly as possible to allow for its consideration before the Winter 2008 semester. (Defs.' Mot. Ex. 10.) In a November 12, 2007, e-mail, Edmunds again raised the issue of making an oral presentation and expressed fear of retaliation for having challenged the on-campus clinical. Ginsberg did not specifically respond to those points but again implored Edmunds to submit his written request in a timely

4

manner. (Defs.' Mot. Ex. 11.)

In a letter dated November 12, 2007, Edmunds made his written request for an off-campus placement for Clinical II. Edmunds recounted his two failed experiences in the on-campus clinical for Clinical I, described his clinical supervisor as neglectful of his academic needs, complained that his clinical supervisor only offered negative feedback and criticism,[5] and asserted that the clinical supervisor was assigning grades based on subjective, personal feelings. Edmunds contrasted this with his experience at the DIC. Edmunds described the variety of clients he was exposed to at the DIC and detailed the amount and type of work he did there. Edmunds praised the assistance and support he received from his DIC supervisor and explained that he felt less stress and anxiety in that placement. Edmunds concluded his letter by requesting that the SLP faculty approve the off-campus placement in the interest of his academic growth and expressed fear that he would be subject to retaliation if forced to enroll in the on-campus clinical. (Defs.' Mot. Ex. 12.)

On the same date as Edmunds's request letter, Edmunds visited EMU's Ombudsman's Office to express his concerns about the on-campus clinical. The Ombudsman's Office referred Edmunds to the Access Services Office ("ASO"). Edmunds's advocate at the ASO arranged for Edmunds to undergo a psychological evaluation for the purpose of identifying possible learning disabilities that might require accommodation. Edmunds was ultimately

---

[5]In his deposition for this lawsuit, Edmunds testified that his clinical supervisor was generally helpful, always provided assistance when requested to do so, and gave constructive feedback on each of his self-evaluations. (Edmunds's Dep. at 53-54, 57.)

5

diagnosed with a learning disorder and anxiety.[6] (*See* Defs.' Mot. Ex. 14.)

Before being notified of Edmunds's disabilities, the SLP faculty decided to deny Edmunds's request for off-campus placement. In a letter dated December 18, 2007, the SLP faculty explained their denial by referring to the requirements of the SLP handbook and noting that Edmunds had not requested the off-campus placement on the basis of a substantiated disability. The faculty promised to reconsider Edmunds's request if he provided substantiation of a disability but also observed that many disabilities can be accommodated within the on-campus clinical setting and are analyzed on a case-by-case basis. The faculty also suggested that Edmunds consider enrolling in the on-campus clinical for the Winter or Spring 2008 semesters with the promised assistance of a faculty support team. (Defs.' Mot. Ex. 13.)

In early January 2008, after the start of the Winter 2008 semester, Edmunds provided the SLP faculty with a letter from the ASO that provided notice of Edmunds's documented

---

[6]It is noteworthy that, during his retake of Clinical I in Fall 2006, Edmunds wrote in a self-evaluation:

> When I have confidence in something, I can do it. If I am not confident, I may do it poorly. I, however, never become anxious or nervous thinking about being observed. It does not worry me that I am being observed: either by parents, my supervisor or other student clinicians. I hear this reported constantly from other students, that they are agitated that others are watching them. What concerns me is, to be honest, if my client perceives that I am unprepared, nervous, uninterested, apathetic, insecure, or scared. It seems that, at least, 50% of the clinical experience in clinic 1 is about being knowledgeable, competent, professional, following proper procedures, etc.

(Defs.' Mot. Ex. 3.)

6

disabilities. In addition to required accommodations regarding extra time and more favorable testing conditions, the ASO letter requested that the SLP program "please allow the student to complete his practicum, internships, and related [sic] in alternative settings on or off campus . . . ." (Defs.' Mot. Ex. 14.) The letter went on to make detailed suggestions regarding the structure of any clinical experience. (*Id.*)

Shortly after receiving Edmunds's ASO letter, the SLP faculty again denied Edmunds's request for off-campus placement for Clinical II. Having considered Edmunds's accommodation requirements the faculty continued to believe that the on-campus clinical presented the best environment for Edmunds. The faculty also expressed concern that they could not ensure the recommended structure of Edmunds's clinical experience if he completed the requirement off-campus. (*See* Defs.' Mot. Ex. 15.) Edmunds's continued to strongly disagree with the faculty's assessment. To resolve the continued disagreement, Edmunds and the SLP faculty embarked on an interactive process whereby they considered various on-campus alternatives and modifications to the typical clinical experience. (Defs.' Mot. Exs. 16-19.) Failing to reach a consensus, the SLP faculty ultimately granted Edmunds's request for an off-campus placement on April 24, 2008. (Defs.' Mot. Ex. 20.)

In the Spring/Summer 2008 semester, Edmunds completed Clinical II in an off-campus placement. By the end of the Winter 2009 semester, Edmunds completed the SLP degree requirements and graduated from the program. A few days after graduation, Edmunds began working part-time at Futures HealthCore. (Edmunds's Dep. at 18-19, 133; Defs.' Mot. Ex. 21.) About two months later, Edmunds accepted full-time employment at Lakeshore Communication Disorders Center ("Lakeshore"). (Edmunds's Dep. at 18-19; Defs.' Mot.

Ex. 22.) In February 2009, Edmunds had received an offer of employment from the DIC that would not begin until September 2009. Because he was employed with Lakeshore by September, Edmunds did not accept the DIC's offer. (*See* Edmunds's Dep. at 156-57.)

## II. Standard of Review

Summary judgment is appropriate only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52, 106 S. Ct. 2505, 2512 (1986). After adequate time for discovery and upon motion, Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to that party's case and on which that party bears the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 2552 (1986).

The movant has an initial burden of showing "the absence of a genuine issue of material fact." *Id.* at 323. Once the movant meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *See Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 1356 (1986). "[The] opposing party may not rely merely on allegations or denials in its own pleading . . . ." Fed. R. Civ. P. 56(e)(2). To demonstrate a genuine issue, the non-movant must present sufficient evidence upon which a jury could reasonably find for the non-movant; a "scintilla of evidence" is insufficient. *See Liberty Lobby*, 477 U.S. at 252, 106 S. Ct. at 2512.

The court must accept as true the non-movant's evidence and draw "all justifiable

8

inferences" in the non-movant's favor. *See id.* at 255. The inquiry is whether the evidence presented is such that a jury applying the relevant evidentiary standard could "reasonably find for either the plaintiff or the defendant." *See id.*

**III. Procedural Due Process**

In his first claim, Edmunds asserts that the individual defendants violated his constitutional right to due process of law by failing to immediately approve his request for off-campus placement in Clinical II. More specifically, Edmunds asserts that the initial denial delayed his graduation and that the delay was caused by an arbitrary and capricious decision made before Edmunds had the opportunity to personally appear at a hearing. To succeed on this claim, Edmunds must establish a denial of due process in conjunction with the deprivation of an interest "encompassed by the Fourteenth Amendment's protection of liberty and property." *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569, 92 S. Ct. 2701, 2705 (1972). Edmunds argues that he had a protected property interest in graduating "on-time." (Pl.'s Resp. at 10-11.)

The property interests protected by the Fourteenth Amendment "may take many forms" and can arise by way of statute, administrative standards, or contract. *Roth*, 408 U.S. at 576, 92 S. Ct. at 2708-09. In any case, however, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Id.*

Beyond his own conclusory assertions, Edmunds fails to present any evidence or authority in support of his claimed property interest in "on-time" graduation. It remains

9

unresolved in the Sixth Circuit whether a student even has an interest in *continued enrollment* at a post-secondary institution, let alone whether there is a further interest in graduating from a post-secondary institution at a certain time. *McGee v. Schoolcraft Cmty. Coll.*, 167 Fed. Appx. 429, 437 (6th Cir. Jan. 18, 2006). Indeed, Plaintiff's counsel conceded at the December 22 hearing that there is no case law in support of Plaintiff's claimed interest in on-time graduation. When presented with a similar claim, another district court observed:

> [T]here is no authority for the proposition that a student enjoys an absolute right to complete a program of study within the "usual" time period. Some students take less time and others require more to complete satisfactorily graduation requirements. The accepted rules and understandings about secondary education in this country do not require students to complete their programs of study in a definite, inflexible amount of time.

*Paoli v. Univ. of Del.*, 695 F. Supp. 171, 173-74 (D. Del. 1988) (footnote omitted).[7] This corresponds with the SLP handbook associated with Edmunds' degree; the handbook fails to include an estimated duration for the program. (Defs.' Mot. Ex. 4.)[8] Because there is no evidence or authority to support Edmunds's claimed interest in "on-time" graduation, Edmunds's procedural due process claim fails as a matter of law.[9]

---

[7]Edmunds attempt to distinguish the educational program at issue in *Paoli* from the degree program in this case does nothing to demonstrate an affirmative interest or entitlement to on-time graduation.

[8]The handbook does place a six year time imitation on completion of the degree requirements, though a student may apply for extensions. (Defs.' Mot. Ex. 4 at 10.) Edmunds completed his requirements after about four and a half years.

[9]Were the Court to continue its analysis of this claim, it would fail for at least two other reasons: (1) the individual defendants afforded Edmunds the requisite procedural due process by providing him with an opportunity to submit his request in writing, and (2) if Edmunds has a right to "on-time" graduation and he was denied procedural due process as to the that right, the individual defendants are entitled to qualified immunity because the right to "on-time" graduation is not clearly established. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532,

## IV. Disability Discrimination

In his second claim, Edmunds argues that EMU engaged in disability discrimination against him in violation of the Rehabilitation Act, 29 U.S.C. § 794. To succeed on this claim, Edmunds must show that he is "(1) disabled under the statute, (2) 'otherwise qualified' for participation in the program, and (3) being excluded from participation in, denied the benefits of, or subjected to discrimination under the program by reason of his . . . disability." *S.S. v. E. Ky. Univ.*, 532 F.3d 445, 453 (6th Cir. 2008).[10] A program that fails to provide reasonable accommodations for disabled persons may be liable for disability discrimination. *Alexander v. Choate*, 469 U.S. 287, 300-01, 105 S. Ct. 712, 719-20 (1985). EMU argues that Edmunds's claim for disability discrimination must fail for a number of reasons, including the fact that it ultimately granted Edmunds's request for an off-campus placement for Clinical II.[11] Edmunds responds that EMU's delay in granting his request is actionable in and of itself, especially when considered in conjunction with his earlier success in an off-campus placement.

Although a delay in granting a reasonable accommodation may support a disability discrimination claim, the delay must be unreasonable for it to be actionable. *See Hurston v.*

---

546, 105 S. Ct. 1487, 1495 (1985); *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).

[10]To succeed on a Rehabilitation Act claim, a plaintiff must also establish that the relevant program is receiving federal financial assistance. *Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 573 (6th Cir. 1998). That element is not in dispute in this case.

[11]EMU also contends that Edmunds is not disabled, that his request for an off-campus placement for Clinical II was unreasonable, and that EMU's decisions regarding modifications to substantial degree requirements are entitled to judicial deference.

11

*Butler County Dept. of Jobs & Family Servs.*, No. 1:01-CV-313, 2005 WL 2416566, at *8 (S.D. Ohio Sept. 30, 2005); *see also Selenke v. Med. Imaging of Colo.*, 248 F.3d 1249, 1262 (10th Cir. 2001) (collecting cases).  In analyzing the delay, courts "consider the length of the delay, the reasons for the delay, whether the [program] has offered any alternative accommodations while evaluating a particular request, and whether the [program] has acted in good faith."  *Hurston*, 2005 WL 2416566, at *8 (quoting *Selenke*, 248 F.3d at 1262-63). A delay is not considered unreasonable when it results from internal processing or events outside the program's control.  *Gerton v. Verizon S. Inc.*, 145 Fed. Appx. 159, 168 (6th Cir. Aug. 18, 2005).

The three-month delay in this case between Edmunds's request for off-campus placement on the basis of his disability and EMU's grant of that request cannot be said to be unreasonable.  EMU first became aware of Edmunds's demand for accommodation when it received the ASO letter in early January,[12] after the Winter 2008 semester had already begun.[13]  Edmunds's accommodation letter suggested, but did not require, that Edmunds be permitted to complete his clinical in an alternative setting "on or off campus."  (Defs.' Mot. Ex. 14.)  Although EMU initially denied the request for off-campus placement,[14] it proceeded

---

[12]Edmunds's prior requests for off-campus placement were not based on his alleged disabilities and, therefore, do not give rise to disability discrimination claims.

[13]EMU was not responsible for Edmunds's failure to present the request until after the Winter 2008 semester began.

[14]EMU was not required to provide the accommodation immediately.  *See Gerton*, 145 Fed. Appx. at 168-69.  Therefore, it is largely irrelevant that Edmunds asserts that he could have arranged for an off-campus placement for the Winter 2008 semester had EMU immediately approved his request in early January.

to engage in an interactive process with Edmunds whereby various on-campus alternatives were explored.[15] In April 2008, EMU decided to grant Edmunds's original request, even though it still considers the request unreasonable. The granting of the request came in time for Edmunds to arrange for an off-campus placement in the Spring/Summer 2008 semester, the semester immediately following his initial request. There is no evidence of bad faith on the part of EMU in this process and, to the extent there was a delay, it was not unreasonable under the circumstances. Therefore, EMU is entitled to summary judgment on this claim.

**V. First Amendment Retaliation**

In his third claim, Edmunds asserts that the individual defendants retaliated against him because of his exercise of his free speech rights under the First Amendment of the Constitution. To prove a First Amendment retaliation claim, it must be established that:

> (1) the plaintiff engaged in protected conduct; (2) an adverse action was taken against the plaintiff that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) there is a causal connection between elements one and two-that is, the adverse action was motivated at least in part by the plaintiff's protected conduct.

*Thaddeus-X v. Blatter*, 175 F.3d 378, 394 (6th Cir. 1999). In this case, Edmunds claims that the individual defendants retaliated against him because of his letter to the Dean of the College of Education and because of statements he made in support of his request for an off-campus placement in Clinical II. Edmunds alleges that, based on that First Amendment activity, the individual defendants initially denied his request for off-campus placement and

---

[15]The initial denial of Edmunds's request did not give rise to an automatic violation of the Rehabilitation Act; it merely acted as the first step in the interactive process between the parties. *See Nichols v. Harford County Bd. of Educ.*, 189 F. Supp. 2d 325, 337 (D. Md. 2002).

13

delayed his graduation.

Under the circumstances of this case, Edmunds cannot show adverse action that would deter a person of ordinary firmness from continuing to engage in protected free speech activities. The student handbook for Edmunds's degree program explicitly requires that students complete two on-campus clinical courses and Edmunds knew that off-campus placements were atypical and could cause chaos in the department. (Defs.' Mot. Ex. 4 at 10; Edmunds's Dep. at 8.) By initially denying Edmunds's request for an off-campus placement, the individual defendants did not interfere with or adversely affect Edmunds's ability to complete his degree program in the ordinary manner. Indeed, the initial denial letter suggests that Edmunds enroll for the Winter 2008 on-campus clinical, as required by the student handbook, with the promised assistance of a faculty support team. (Defs.' Ex. 13.) Simply put, this means that Edmunds faced the same performance requirements both before and after he engaged in protected activity. Furthermore, the individual defendants ultimately granted Edmunds's request for off-campus placement and Edmunds got exactly what he wanted after only a limited delay. Such consequences would not deter an ordinary person or an ordinary post-secondary education student from expressing dissatisfaction with program requirements or making requests for variances therefrom. Because Edmunds cannot establish the second element of his First Amendment retaliation claim, the individual defendants are entitled to summary judgment.

## VI. Gender Discrimination

In his fourth claim, Edmunds argues that EMU engaged in gender discrimination against him in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681.

14

Because Title IX itself fails to provide an analytical framework for gender discrimination claims, the Sixth Circuit has opted to apply the *McDonnell Douglas* burden shifting analysis used in Title VII employment discrimination cases. *Ivan v. Kent State Univ.*, No. 94-4090, 1996 WL 422496, at *2 (6th Cir. July 26, 1996). Therefore, Edmunds must first establish a prima facie case by showing (1) his membership in a protected class, (2) adverse action by EMU, (3) his qualification for the opportunity that was denied, and (4) that a comparable non-protected person received better treatment. *Id.* at *2 n.9. If Edmunds meets that burden, EMU must "articulate a legitimate, nondiscriminatory reason for the adverse . . . action taken. The burden of production then reverts to [Edmunds] to rebut the reason given as pretextual." *Id.* at *2. Edmunds alleges that the initial denial of his request and the resulting delay in his graduation amounted to impermissible gender discrimination.

Like his other claims, Edmunds's gender discrimination claim fails as a matter of law. For the reasons discussed above in Sections IV and V regarding the requirements of Edmunds's degree program, the reasonableness of the delay, and the ultimate granting of Edmunds's request, the Court concludes that there was no adverse action in this case. And, even if the initial denial of Edmunds's request is considered adverse action, Edmunds still cannot show that a comparable non-protected person received better treatment. While there is evidence that a female student was granted off-campus placement for clinical after an e-mail exchange between two professors, (Pl.'s Ex. 5), that student was not similarly situated to Edmunds. Edmunds sought to avoid the on-campus clinical for his own convenience and because of his own discomfort and disabilities; the other student was incapable of serving the clientele of the on-campus clinic at EMU because of a foreign accent. Rather than leaving

15

the academic environment altogether, however, the other student satisfied her clinical requirements by serving in a clinical area at a nearby university. There is no other evidence that a comparable non-protected student received better treatment than Edmunds.[16] Because Edmunds cannot establish a prima facie case of discrimination,[17] EMU is entitled to summary judgment.

## VII. Conclusion

Although there was a limited delay between the time Edmunds requested an off-campus placement for Clinical II and the granting of that request, Edmunds ultimately received the exact variance he requested and graduated from his degree program. For the reasons discussed above, Edmunds's due process, discrimination, and retaliation claims fail as a matter of law.

Accordingly,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED**.

A judgment consistent with this order shall enter.

<u>s/PATRICK J. DUGGAN</u>
UNITED STATES DISTRICT JUDGE

Copies to:
Marlo D. Smith, Esq.
Debra McCulloch, Esq.
Claire S. Harrison, Esq.

---

[16]Another female student was permitted to complete an internship outside the normal geographical area for Edmunds's degree program. (*See* Defs.' Ex. 7 ¶ 16.) This situation is not comparable to Edmunds's situation, however, because all internships are completed off-campus.

[17]Even if the evidence in this case supports a prima facie case of gender discrimination, Edmunds cannot show that EMU's legitimate, non-discriminatory reasons for initially denying Edmunds's request—concerns regarding the academic standards of the program—were mere pretext.